IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| AWILDA IGLESIAS-SOLIS<br><br>Plaintiff<br><br>v.<br><br>IPR PHARMACEUTICALS<br><br>Defendant | Civil No.: 3:11-cv–01137-SEC<br><br><br>TITLE VII, ADEA, SEPARATION PAY, TORTS<br><br>PLAINTIFF DEMANDS TRIAL BY JURY |

**JOINT CASE MANAGEMENT MEMORANDUM**

**TO THE HONORABLE COURT:**

COME NOW the parties, Plaintiff, Awilda Iglesias-Solis ("Plaintiff" or "Iglesias"), and Defendant IPR Pharmaceuticals, Inc. ("Defendant" of "IPR"), through their respective attorneys, and pursuant to the Case Management Order issued on April 12, 2011 in the captioned case, very respectfully submit the present Joint Case Management Memorandum:

All facts, witnesses, documentary evidence and proposed discovery deadlines stated below are based on the parties' knowledge and belief up to the present, and are subject to revision contingent on future discovery and investigation.

I. FACTUAL CONTENTIONS

**A.    Plaintiff**

IPR is a wholly owned subsidiary of AstraZeneca, a global, process-centric, end-to-end supply-chain integrated biopharmaceutical company. As a process-centric global corporation, AstraZeneca strives to operate under a philosophy it calls "Lean organization". The buzz-word "Lean", as adopted by AstraZeneca, essentially means that

it builds "Quality and Continuous Improvement" into its business processes, beginning from the evaluation of specification and functionality requirements, all throughout process conceptual design and inception, such that they result in simple and robust systems.

Iglesias first joined IPR as a contractor hired as an Office Clerk in the Maintenance and Engineering department, around January, 1999. On or around 2000, Iglesias applied for and was chosen for an IPR internal posting of a Purchasing Assistant II, a "non-exempt" position. Iglesias' yearly compensation as a "non-exempt" employee of IPR reached up to $37,395.07. From May 11, 2009, until her termination on August 10, 2010, Iglesias occupied the position of QA Document Reviewer I, in the Quality Assurance Department, an "exempt" position with a yearly compensation of $41,600.00. Shortly before her termination, IPR had already hired her replacement, a younger male, with considerable less experience, who consequently is outside her protected class.

Beginning on 2006 AstraZeneca announced a global integration initiative of its business processes, which would propend to operation consolidation, elimination of redundant support organizations, and the consequential reduction of employee head-count. The most significant driver to achieve all of these objectives was the eventual consolidation of the entire Information Technology infrastructure into a single-instance software based solution, which would host a set of common business processes throughout the globe. AstraZeneca enforced this same initiative on IPR starting on 2007. Although AstraZeneca called for an objective implementation of the ensuing Reduction In Force (RIF) initiative, based on documented quantifiable metrics and business cases, IPR in its stead instituted a practice of deliberately singling out for termination employees belonging to Iglesias' statutorily protected classes, namely gender and age based.

As Iglesias moved into the last position she occupied in IPR in 2009, her day-to-day activities involved interaction with complex software based applications to which she had had no prior exposure. Iglesias was not offered any form of formalized training in such systems, which in itself was a cardinal sin under the implementation methodologies and practices adopted globally by AstraZeneca, and handed down to IPR. Contrarily, in transitioning Iglesias into her new position, IPR only provided her with printed, self-study materials, which she was required to cover in her own time and schedule. Iglesias was never furnished a basic job description of her new position.

IPR's implementation of the software solution supporting the tasks with which Iglesias interacted resulted in manually-intensive, fragmented, business processes which required multiple hand-offs of the work product between the different IPR organizations. Said process fragmentation, consequently, required the implementation of multiple non-value-adding verification tasks, which was yet another instance of a cardinal sin under the implementation methodologies and practices adopted globally by AstraZeneca.

For instance, in all of the incidents in which IPR purports that Iglesias had exhibited performance issues, Iglesias initiated a process which triggered at least four (4) separate hand-offs, each one with its own separate verification point. Any purported mistake made by Iglesias upstream in the process, before becoming a manufacturing "deviation", necessarily had to be overlooked by each person or organization receiving the hand-off, upon their duty to verify said work product. Without exception, all individuals who should have shouldered the same responsibility as Iglesias in the aforementioned incidents were outside both of her statutorily protected classes. Also, without exception, none of those individuals were disciplined as a consequence of the resulting "deviations".

**B.    Defendant**

IPR is a pharmaceutical manufacturing company which produces pharmaceutical products in Puerto Rico used to treat and manage a wide variety of medical conditions including asthma, migraines, hypertension, heart disease, and prostate cancer, among others.  IPR is an equal opportunity employer with robust policies and procedures in place to prohibit unlawful discrimination, including age discrimination.   Furthermore, IPR actively promotes its equal employment opportunity policies.   All of its employees - and Iglesias was no exception -  receive a copy of these policies upon commencing their employment with IPR.

Iglesias was hired by IPR as a regular employee on October 19, 2000 as a Purchasing Assistant II and she held this position until May 9, 2010.  Following the implementation of a new organization structure, Iglesias applied for the position of Quality Assurance Process Reviewer I ("QA Process Reviewer I") on April 14, 2009 and was hired for this position on May 11, 2009.  Iglesias held this position until August 9, 2010 when IPR terminated her employment.

Beginning in 2007 IPR determined that it had to revise its organizational structure and, as part of this process, it would have to undergo a reduction-in-force ("RIF").  To address the need for a RIF, IPR first implemented a voluntary program for its employees called *Renuncia Voluntaria Incentivada,* referred to internally by IPR as "RVI".  The purpose of the RVI was to facilitate the necessary restructuring of the company by providing a financial incentive to its employees for voluntarily resigning from IPR, regardless of whether their employment would be terminated or not as part of the RIF.

Age and gender were not factors in any aspect of the decisions made during the restructuring process.  Iglesias chose not to resign from her position as Purchasing Assistant II at IPR under the RVI and remained employed at IPR.

Once the RVI process was underway, IPR identified a series of positions for elimination in order to comply with its RIF goals. Iglesias' position at the time, Purchasing Assistant II, was one of the positions that was identified for elimination.   Despite its decision to eliminate Plaintiff's  Purchasing Assistant II position, IPR did not terminate Iglesias's employment during the restructuring process.  On the contrary, Iglesias - along with the other employees whose positions were identified for elimination and chose not to participate in the RVI program - was placed on a list referred to as a "deployment list." The deployment list was a mechanism IPR developed so it could situate the employees whose positions were selected for elimination but did not resign under the RVI into new positions at IPR. The employees on the deployment list were aware that their position had been selected for elimination, but that they would have the opportunity to apply for available positions within IPR's new business structure. IPR regularly updated the employees on the deployment list regarding available positions, and were given priority in IPR's selection of candidates for available positions. If selected for the positions they applied for, the employee would be able to maintain their employment at IPR.   With this system, IPR sought to meet its business restructuring goals while forgoing the measure of laying off employees whose positions were impacted by the RIF but did not resign under the RVI.

On December 19, 2008, IPR made Iglesias a transfer offer for the position of Packaging Document Clerk which she rejected on December 22, 2008.  On January 14,

2009, IPR informed Iglesias of an opening for the position of Integrated Assurance Analyst. On Februay 25, 2009, IPR informed Iglesias of an opening for the position of QA Technician I.   On April 13, 2009, IPR made Iglesias a transfer offer for the position of Documentation Clerk which she rejected on April 15, 2009.  On May 8, 2009, IPR offered Iglesias a transfer to the position of QA Process Reviewer I in IPR's Label Store which Plaintiff accepted.  Iglesias received an increase in salary when she accepted the QA Process Reviewer I position in IPR's Label Store.

As QA Process Reviewer I, Iglesias duties included:  sampling and inspecting labeling material in a timely manner; preparing and reviewing labeling material inspection reports to assure completeness and Good Manufacturing Practices ("GMP's"); and preparing and dispatching all labeling materials required in the Bill of Material ("BOM") for the packaging of specific products.  In addition to the aforementioned duties, Iglesias was also responsible for updating and following the Key Performance Indicators ("KPI's") for the Label Store; maintaining the accountability of labeling materials using the Inspira System; and identifying areas where appropriate documentation is required or needs updating to ensure compliance with GMP's, among others.

In order to facilitate Iglesias' transition to her new position and ensure her success as QA Process Reviewer I, her Immediate Supervisor at the Label Store, Leslie Rodríguez ("Rodríguez"), extended Iglesias' training period over the course of five (5) months. Furthermore, Rodríguez instructed Janet Ramírez ("Ramírez") a Coordinator in the Label Store to be available to Iglesias to address any questions or concerns Iglesias might have about the work she was expected to perform.

Despite her supervisor's and co-workers efforts, however, Iglesias, encountered major performance problems.  On July 27, 2010, Rodríguez issued Iglesias a disciplinary action and a corrective action plan, both verbally and in writing.  The basis for said disciplinary action and corrective action plan were two separate events, one on June 18, 2010 and another on July 12, 2010.  On these dates, Iglesias grossly mishandled her job duties resulting in Major Quality Incidents for IPR.  Due to the proximity of the aforementioned incidents and the level of their seriousness, Iglesias was suspended from work for ten (10) days, beginning July 17, 2010 and returning to work on July 29, 2010. Iglesias was informed both verbally and in writing that upon her return to work she would be placed on a corrective action plan for the next twelve (12) months.  The corrective action plan clearly identified the areas where Iglesias needed to show improvement and established a schedule for reviewing her expected improvement.

Iglesias returned to work following her suspension on July 29, 2010.  On August 5, 2010 - within a week of her return - Iglesias failed to adequately perform her duties which resulted in a plant deviation.  Subsequently,  IPR terminated Iglesias' employment on August 9, 2010.

Iglesias claims that her termination was somehow related to her age and gender, and that IPR unlawfully pressured members of her protected class to resign under the RVI. Iglesias, however, offers no proof to sustain this claim.  IPR denies that any sort of age and/or gender related animus motivated Iglesias' termination, or that age or gender played any role in its business restructuring which included a RIF.  Of note is the fact that at the time Iglesias commenced her employment at IPR as a regular employee in 2000 she was already over the age of forty and a member of the protected age group.  Furthermore,

when IPR made her transfer offers and ultimately selected her for the position of QA Process Reviewer I, she was over fifty years of age.

## II.  LEGAL CONTENTIONS

**A.    Plaintiff**

### 1.        Plaintiff does establish a prima facie case of age discrimination

There is no contention between Plaintiff and Defendant in regards to the legal authorities and precedents applicable in this case, and cited by IPR below. The only existing contention between Plaintiff and Defendant is fact based: with the fact pattern as laid out above by Plaintiff, she does in fact establish that indeed she suffered an adverse employment action motivated by age; that IPR's purported justification for the adverse employment action is merely a pretext; and that similarly situated individuals outside of her protected class were treated differently, or more favorably, under the same established facts.

IPR's claim that Iglesias last assignment constituted a "promotion" based solely on a higher salary is also without merit. Iglesias' "non-exempt" salary of $37,395.07, with a right to earn overtime pay was considerably lower than her "exempt" salary of $41,600.00, with no right to overtime pay.

IPR's contention that Iglesias cannot claim that she was discriminated against by the same employer who hired her is also without merit. As laid out by IPR itself, Iglesias was not the same person IPR hired in 1999, that she was when she was terminated in 2010. Also, IPR's own fact pattern reveals that the people who hired her in 1999, are a substantially different group from the people who fired her in 2010.

2.    **Plaintiff does establish a prima facie case of gender discrimination**

There is no contention between Plaintiff and Defendant in regards to the legal authorities and precedents applicable in this case, and cited by IPR below. The only existing contention between Plaintiff and Defendant is fact based: with the fact pattern as laid out above by Plaintiff, she does in fact establish that indeed she is a member of a protected class, that she was performing her job adequately, that she suffered an adverse employment, and that she was replaced by someone of lesser qualifications.

3.    **Plaintiff does establish a valid cause of action under Act No. 80**

Having established her employment discrimination causes of action above, it necessarily follows that Iglesias is entitled to an award of separation pay under this statute.

4.    **Plaintiff does establish a valid cause of action under Articles 1802 and/or 1803 of the Puerto Rico Civil Code**

IPR's contention that Act No. 80 precludes relief under these general tort actions is also without merit. Iglesias' right of action here stems not from her right to receive separation pay, but from the discriminatory acts brought under the Federal statutes, age and gender discrimination. Iglesias can conceivably not meet the requirements under the Federal statutes, and still be entitled to relief under general tort actions, whether or not she had been extended separation by IPR at the time of her termination.

B.    **Defendant**

1.    **Plaintiff cannot establish a *prima facie case* of age discrimination**

Under the ADEA, it is "unlawful for an employer...to discharge any individual or otherwise discriminate against any individual...because of such individual's age." 29 U.S.C. § 623(a)(1).  Pursuant to the ADEA, an employer cannot take an adverse employment

action against an employee who is forty years old or older based on that employee's age. *See* 29 U.S.C. §§ 623(a)(1) 631(a).  Therefore, in order to state a claim under the ADEA, a plaintiff must establish that he "suffered an adverse job action, that this was motivated by age, and that he suffered injury as a result of it." Melendez-Arroyo v. Cutler-Hammer de P.R. Co., 273 F. 3d 30, 33 (1ˢᵗ Cir. 2001).

In discrimination cases where direct evidence of unlawful discrimination is absent, courts apply the framework which the U.S. Supreme Court established in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).  Under the *McDonnell Douglas* framework, the plaintiff bears the ultimate burden of establishing a *prima facie* case of discrimination. *Id.; see also* Velázquez-Fernández v. NCE Foods, Inc. 476 F.3d 6, 11 (1st Cir. 2007).  Furthermore, the United States Supreme Court recently clarified in Gross v. FBL Fin. Servs., 129 S.Ct. 2343, 2352 (2009), that a plaintiff has the ultimate burden to prove by a preponderance of the evidence that age "was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Fin. Servs., 129 S.Ct. at 2352.  In other words, a plaintiff bears the ultimate "burden of proving that....[he] would not have been fired but for h[is] age." Morales-Figueroa v. Banco Bilbao Viscaya Argentaria, 550 F. Supp. 2d 220, 224 (D.P.R. 2007)(citations omitted). Plaintiff has to demonstrate the elements of a *prima facie* case by a preponderance of evidence.  Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 252-253 ( 1981).

In order to establish a *prima facie* case of age discrimination, a plaintiff must show by a preponderance of the evidence that she: 1) was at least forty years old; 2) met with her employer's legitimate job expectations; 3) was subject to an adverse employment action; and 4) the employer did not treat age neutrally.  Rivera Aponte v. Restaurant

Metropol #3, Inc., 338 F.3d 9, 11 (1st Cir. 2003).

Once a plaintiff establishes a *prima facie* case, "the burden shifts to the employer to articulate some 'legitimate, nondiscriminatory reason' for its employment action." Feliciano de la Cruz v. El Conquistador Resort and Country Club 218 F.3d 1, 5 (1st Cir. 2000) (citing McDonnell Douglas, *supra*). "[T]he defendant must clearly set forth, through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." *Id.* at 5-6. "The employer's burden is minimal - it need do no more than articulate a reason which, on its face, would justify a conclusion that the plaintiff was let go for a nondiscriminatory motive." Torrech-Hernández v. GE, 519 F.3d 41, 48 (1st Cir. 2008) *citing* Dávila v. Corporación de Puerto Rico para la Difusión Pública, 498 F.3d 9, 12 (1st Cir. 2007).

Once an employer establishes a valid, non-discriminatory reason for the alleged adverse employment action, any presumption of discriminatory intent which might exist, no longer remains. Reeves v. Sanderson Plumbing, 530 U.S. 133, 142-143, (2000); González v. El Día Inc.,304 F. 3d 63, 69 (1st Cir. 2002). Under *McDonell Douglas*, following the employer's offering of a legitimate, non-discriminatory reason for the alleged adverse employment action, the burden then shifts back to the plaintiff who must now demonstrate that said reason is merely a pretext for discrimination, **and** that the true reason for the adverse employment action is discriminatory pretextual. *See* McDonnell Douglas Corp, *supra* at 804-805 and Feliciano de la Cruz v. El Conquistador Resort and Country Club 218 F.3d 1, 6 (1st Cir. 2000). Most importantly, when ascertaining whether pretext exists "a court's focus must be on the perception of the decision maker, that is,

whether the employer believed its stated reason [for the adverse action] to be credible." Zapata-Matos v. Reckitt & Coleman, Inc., 277 F. 3d 40, 45 (1st Cir. 2002).

Iglesias cannot demonstrate that IPR discriminated against her during the Company's restructuring process, nor can she show that she met her employer's legitimate job expectations once she was transferred as part of this process. *See* Velázquez-Fernández, *supra*. To the contrary, the evidence shows that, not only did Iglesias not suffer an adverse employment action during iPR's restructuring process, but, in fact, she received a promotion as a result of her transfer to the position of QA Process Reviewer I which included an increase in salary. Iglesias was provided with more than sufficient training and resources to acclimate to her new position. IPR made every effort to ensure that Iglesias would be able to thrive as QA Process Reviewer I so that she would remain in their employ. Iglesias, however, cannot establish that she did meet her employer's legitimate job expectations; therefore she fails to establish a *prima facie* case of age discrimination as required under *McDonnell Douglas*. McDonnell Douglas, *supra; and* Velázquez-Fernández, *supra, citing* Suárez v. Pueblo Int'l, Inc., 229 F.3d 49, 53 (1st Cir.2000).

Furthermore, when Iglesias commenced her tenure as a regular employee at IPR she was already in the protected age group and when she was offered a transfer to the better paying position of QA Process Reviewer I she was over 50 years of age. It simply does not follow that IPR would take several direct measures to preserve Iglesias' employment (making her transfer offers, selecting her for a position within the company's new structure, and providing her with extensive training and support to improve her performance) when she was already well into the protected age group, to then terminate

her employment because of her age about a year and a half later. *See* Proud v. Stone, 945 F.2d 796, 798 (4th Cir. 1991) ("[E]mployers who knowingly hire workers within a protected group seldom will be credible targets for charges of pretextual firing").

Even assuming that Iglesias did manage to establish a *prima facie* case, which she does not, IPR had a legitimate and non-discriminatory reason for terminating her employment: her deficient performance which was marked by a pattern of serious deviations from the correct procedures for carrying out her duties. Iglesias cannot demonstrate that IPR's reasons for her termination are a mere pretext to conceal an actual instance of age discrimination. She therefore fails to shoulder her burden under *McDonnell Douglas*. McDonnell Douglas Corp, *supra* at 804-805.

In light of the above, Plaintiff's claims under the ADEA should be dismissed.

2. **Plaintiff cannot establish a *prima facie* case of gender discrimination**

Similarly, Iglesias' claim of discrimination due to gender under Title VII of the Civil Rights Act of 1964, ("Title VII"), suffers the same fate as her ADEA claim: she lacks any direct evidence of gender discrimination and can therefore not establish a *prima facie* case of such discrimination under Title VII.

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* Title VII prohibits employers from discriminating against any individual on the basis of sex among other prohibited categories. 42 U.S.C. § 2000e-2(a). An employer is liable under Title VII when sex has "actually played a role in the employer's decision making process and had a determinative influence on the outcome." Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 141 (2000) *citing* Hazen Paper Co. v Biggins, 507 US 604, 610 (1993). However, the burden of demonstrating that IPR based its decision to terminate Iglesias'

employment on her sex and that her employer intentionally discriminated against her ultimately falls on Iglesias. Reeves, *supra* at 143 *citing* Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 253 (1981).

The First Circuit Court of Appeals has stated that in the absence of direct evidence, "the plaintiff must meet the burden shifting framework articulated in McDonnell Douglas Corp. v. Green," which is described above in the context of age discrimination. Rivera-Santiago v. Abbot,  609 F. Supp 2d 167 (1st Cir. 2009) *citing* Sabinson v. Trustees of Dartmouth College, 542 F. 3d 1, 4 (1st Cir. 2008)(internal quotations omitted).  While the elements of a gender discrimination *prima facie* case are not identical to those in an age discrimination case, the factors considered for purposes of the *McDonnell Douglas* burden shifting test are certainly very similar.  In a gender discrimination case an employee must show that  "(1) she is a member of a protected class; (2) she was performing her job at a level that rules out the possibility that she was fired for inadequate job performance; (3) she suffered an adverse job action by her employer; and (4) her employer sought a replacement for her with roughly equivalent qualifications." Smith v. Stratus Computer, Inc. 40 F.3d 11, 15 (1st Cir. 1994) *citing* Mesnick v. General Elec. Co., 950 F.2d 816, 823 (1st Cir.1991), *cert. denied*, 504 U.S. 985, 112 S.Ct. 2965 (1992). Emphasis added.

As stated before, because Iglesias cannot prove that she met her employer's legitimate job expectations, IPR respectfully submits that Iglesias cannot establish a *prima facie* case of gender discrimination as required under *McDonnell Douglas.*  McDonnell Douglas, *supra.*  Even assuming that Iglesias did manage to establish a *prima facie* case of gender discrimination- which she did not-  IPR has articulated a  legitimate and non-discriminatory reason for its decision to terminate her employment, namely Iglesias' notably

deficient performance.  Iglesias, meanwhile offers no proof that this reason is merely a pretext for IPR to conceal actual gender discrimination.

Thus, even if we were to assume for argument's sake that Iglesias had managed to establish a *prima facie* case of gender discrimination, she still did not establish that IPR's legitimate and non-discriminatory reason - her exceedingly poor performance of her duties - was a mere pretext to discriminate against her based on gender.

### 3.    <u>Plaintiff cannot establish a valid cause of action under Act No. 80</u>

Under Puerto Rico Act No. 80 of May 30, 1976, P.R. Laws Tit. Ann. 29 § 185a <u>et seq</u>, ("Act 80"), an employer must have "just cause" to terminate an employee; otherwise the employer will be liable for the severance pay provided by the Act.  The Puerto Rico Supreme Court has held that such "just cause" for dismissal must be based on grounds that are related to the orderly running and normal operation of a business,  not the capricious whim of an employer. <u>Secretary of Labor v. ITT</u>, 108 D.P.R. 536 (1979).

Under Article 2 of Act No. 80, when an employee is not performing her work in an efficient manner, or is doing it negligently or in violation of the standards of quality, her employer has "just cause" to terminate that employee's employment.  P.R. Laws Ann. Tit. 289, § 185b(b).  The same would apply if the employee engages in repeated violations of the employer's rules and regulations.  P.R. Laws Ann. Tit. 29, § 185b(c).

In the instant case, Iglesias cannot contest the fact that legitimate business reasons related to the orderly running and normal operation of its business motivated IPR to terminate her employment. Within the span of a few weeks she was at the root of two Major Quality Incidents followed by one plant deviation, which amounts to the deficient performance mentioned in Article 2 of Act No. 80.  In the face of Iglesias'  " pattern of

improper or disorderly conduct," IPR had just cause under Act No. 80 to terminate her employment.   Looked at objectively, Iglesias' repeated failure to follow proper procedures directly interfered with IPR's normal business operations.   Iglesias' termination was therefore not capricious - it was a necessity in order to preserve the proper and normal operation of IPR's business.  Therefore, Iglesias' claims under Act No. 80 should also be dismissed.

> **3.** **Plaintiff cannot establish a valid cause of action under Articles 1802 and/or 1803 of the Puerto Rico Civil Code**.

Iglesias alleges that she has a cause of action under Articles 1802 and 1803 of the Puerto Rico Civil Code, P.R. Laws Ann. Tit. 31, § 5141 and 5142, which govern tort claims in Puerto Rico.  Iglesias' state claims arise under the special Puerto Rico employment statute Act No. 80.   Under these circumstances, the remedies provided by Act No. 80 prevail over a general statute such as Article 1802 and 1803.  Medina v. Adecco, 2008 WL 2428207 (D.P.R. June 12, 2008.) Iglesias'claims under Articles 1802 and 1803 should therefore be dismissed.

## III. FACT AND EXPERT WITNESSES

**A.**   **Plaintiff**

Plaintiff has yet to determine which individuals will testify at trial. Notwithstanding, Plaintiff has identified the persons who have knowledge of the facts related to the allegations in the Complaint in the Report of Parties' Planning Meeting to be filed on this date.

**B.     Defendant**

Defendant has yet to determine which individuals will testify at trial.  However, the following persons have knowledge of the facts related to the allegations in the Complaint:

| NAME | SUBJECT MATTER |
|------|----------------|
| Evelyn Medina,<br>*Human Resources Manager, IPR* | Medina has knowledge of IPR's policies and procedures, Plaintiff's employment history at IPR; the re-structuring of IPR's operations which included a Reduction in Force ("RIF"); the components of IPR's RIF strategy; the neutrality of the RIF process with respect to age and/or gender; the effect of the RIF on Plaintiff's employment at IPR; progressive discipline measures applied to Plaintiff due to her poor performance;the just cause for Plaintiff's termination; the decision to terminate Plaintiff's employment; Plaintiff's termination of employment; and Defendant's defenses against Plaintiff's allegations of age and gender discrimination. |
| José Aponte,<br>*Human Resources Manager and Integrated Risk Management Team Leader, IPR* | Aponte has knowledge of IPR's policies and procedures, Plaintiff's employment at IPR; progressive discipline measures applied to Plaintiff due to her poor performance and Plaintiff's termination of employment; and Defendant's defenses against Plaintiff's allegations of age and gender discrimination |
| María Valentín,<br>*Human Resources Transactional Facilitator, IPR* | Valentín has knowledge of IPR's policies and procedures; the re-structuring of IPR's operations which included a Reduction in Force ("RIF"); the components of IPR's RIF strategy; the neutrality of the RIF process with respect to age and/or gender; the effect of the RIF on Plaintiff's employment at IPR; |

| | |
|---|---|
| | and Defendant's defenses against Plaintiff's allegations of age and gender discrimination |
| Leslie Rodríguez, *Quality Assurance Process Execution Team Facilitator, IPR* | Rodríguez was Plaintiff's supervisor at the time her employment was terminated and has knowledge of the following topics: IPR's policies and procedures regarding Quality Assurance as these pertain to its Label Store; the day to day running of IPR's label store; Plaintiff's duties in her position as Quality Assurance Process Reviewer I in IPR's label tore and her work schedule; Plaintiff's work environment in IPR's label store; the content and time-frame of Plaintiff's training process for said position; Plaintiff's performance of her duties in said position; acts and/or omissions by Plaintiff which resulted in Process Deviations at IPR; the investigation of said Process Deviations and their magnitude; the corrective action plan and other disciplinary measures applied to Plaintiff; the decision to terminate Plaintiff's employment; Plaintiff's termination of employment; and Defendant's defenses against Plaintiff's allegations of age and gender discrimination. |
| Janet Ramírez, *Quality Assurance Lead Process Reviewer, IPR* | Ramírez was Plaintiff's co-worker in IPR's label store and participated in training Plaintiff for her position as Quality Assurance Process Reviewer I. Ramírez has knowledge of the following topics: IPR's policies and procedures regarding Quality Assurance as these pertain to its Label Store; Plaintiff's work environment in IPR's label store; the content and time-frame of Plaintiff's training process for the position of Quality Assurance Process Reviewer I; Plaintiff's performance of her duties in said position; acts and/or omissions by Plaintiff which resulted in Process Deviations at IPR; and the investigation of |

| | said Process Deviations and their magnitude. |
| --- | --- |
| Nilda Santiago,<br>*GOI Lead Business Partner* | Santiago has knowledge of IPR's electronic information systems and the sources and categories of electronically stored information. |
| José A. Rodríguez Bonilla<br>*Sr. IT Infrastructure Supervisor* | Rodríguez has knowledge of IPR's electronic information systems and the sources and categories of electronically stored information. |

All of the persons named above are IPR employees and maybe contacted through IPR's legal counsel.

As to expert witness(es), Defendant will make its expert disclosures pursuant to Fed. R. Civ. P. 26(a)(2), if any, once Plaintiff has made her disclosures regarding experts. Defendant reserves the right to supplement this list and/or delete any of these individuals as witnesses once discovery is completed.  Defendant also reserves the right to include in its list of witnesses any or all of the witnesses announced by the Plaintiff.

## IV. <u>DOCUMENTARY EVIDENCE</u>

**A.     Plaintiff**

Plaintiff has determined that substantially all of the documents she will use to support her claim are official business records under the custody of IPR, and which she intends to secure through the discovery process.

**B.     Defendant**

At this early stage of the litigation, Defendant has not determined all of the documents it will use to support its contentions.  However, Defendant may use any or all of the following.

1.    Plaintiff's personnel file at IPR

2.    Job description for Quality Assurance Process Reviewer I.

3.    IPR's relevant policies and procedures, including but not limited to:

    a.    Equal Employment Opportunity

    b.    Code of Conduct

    c.    Progressive Discipline

    d.    Signed acknowledgment regarding receipt of employee manual and other policies.

5.    Documents regarding IPR's transfer offers when Plaintiff was on deployment list.

6.    Documents with relevant information regarding IPR's reduction in force.

7.    Documents related to Plaintiff's performance and progressive disciplinary measures.

8.    Information and data regarding transactions conducted by Plaintiff in the SAP label store module.

9.    Information and data related to QA deviations and corrective actions for transactions conducted by Plaintiff as tracked the Enterprise Component Management System ("ECMS")

10.   Information and data regarding the Major Quality Incidents generated as a result of transactions conducted by Plaintiff.

11.   Standard Operating Procedures ("SOP") applicable to the label store.

12.   History of trainings taken by Plaintiff as maintained in the Training Compliance Management System.

Defendant reserves the right to reduce or expand this list, should it become necessary as a result of the discovery to be conducted or otherwise and pursuant to Fed. R. Civ. P. 26(e).

## V. DISCOVERY THAT THE PARTIES WISH TO CONDUCT

On this same date, the parties have filed a Report of Parties' Planning Meeting which was held on May 3, 2011.

## VI. PARTIES' JOINT PROPOSED UNCONTESTED FACTS

1.      Iglesias began work as a regular employee at IPR on October 19, 2000.

2.      IPR underwent a restructuring of its business operations during the time period relevant to the allegations in the Complaint.

3.      Part of IPR's restructuring program was a Reduction in Force ("RIF").

4.      Prior to the RIF process, IPR implemented a program where employees could voluntarily resign in exchange for a financial incentive.  This voluntary program was referred to at IPR as "RVI" based on its Spanish acronym.

5.      Iglesias chose not to participate in the RVI program.

6.      Iglesias' position of Purchasing Assistant II was selected for elimination as part of IPR's restructuring of its business.

7.      Iglesias voluntarily accepted her transfer to the position of QA Process Reviewer I.

8.      Iglesias was disciplined verbally and in writing by her supervisor Leslie Rodríguez regarding the performance of her duties.

9.      Leslie Rodriguez developed a performance plan for Iglesias and informed her of its content.

10.    IPR has policies and procedures in place prohibiting unlawful discrimination.

11.    Iglesias received and was aware of IPR has policies and procedures prohibiting unlawful discrimination.

## VII. OTHER MATTERS

The parties reserve the right to amend or supplement the instant Joint Case Management Memorandum.

RESPECTFULLY SUBMITTED.

In San Juan, Puerto Rico, this 13th day of May, 2011.

| | |
|---|---|
| **WILLIAM E. MELÉNDEZ**<br>Attorney for Plaintiff<br>410 Park Avenue<br>15th Floor, Suite #1223<br>New York, NY 10022<br><br>**MIGUEL A. CUADROS-PESQUERA**<br>Attorney for Plaintiff<br>Cuadros & Cuadros<br>701 Ponce de León Ave., Suite 215<br>San Juan, PR 00907<br><br>**S/ William E. Meléndez**<br>William E. Meléndez<br>USDC-PR No. 226902<br>Telephone: (718) 725-7387<br>Facsimile: (787) 759-2750<br>We.Melendez@e-Lex.us<br><br>**S/ Miguel A. Cuadros-Pesquera**<br>Miguel A. Cuadros-Pesquera<br>USDC-PR No. 114814<br>Telephone: (787) 725-2652<br>Facsimile: (787) 724-3820<br>macuadros@cuad-law.com | **McCONNELL VALDÉS LLC**<br>Attorneys for IPR Pharmaceuticals, Inc.<br>270 Muñoz Rivera Avenue<br>San Juan, PR 00918<br>www.mcvpr.com<br><br>**S/ Alfredo M. Hopgood-Jovet**<br>Alfredo M. Hopgood-Jovet<br>USDC-PR No. 205302<br>Telephone: (787) 250-5689<br>Facsimile: (787) 759-2750<br>ah@mcvpr.com<br><br>**S/ Maralyssa Álvarez-Sánchez**<br>Maralyssa Álvarez-Sánchez<br>USDC-PR No. 224011<br>Telephone: (787) 250-5682<br>Facsimile: (787) 759-2750<br>max@mcvpr.com |